# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LIQUIDNET, INC.,<br><br>            Plaintiff,<br><br>        v.<br><br>ITG, INC. and THE MACGREGOR GROUP,<br>INC.,<br><br>           Defendants. | Civil Action No. 06-_____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL

Plaintiff Liquidnet, Inc, for its cause of action for patent infringement against the Defendants, states and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement.  Plaintiff Liquidnet, Inc. ("Plaintiff" or "Liquidnet") is the assignee of United States Patent No. 7,136,834 B1 ("the '834 patent"), entitled "ELECTRONIC SECURITIES MARKETPLACE HAVING INTEGRATION WITH ORDER MANAGEMENT SYSTEMS".  The '834 patent was duly and lawfully issued by the United States Patent and Trademark Office on November 14, 2006 in the names of the inventors, Seth Merrin, John Halloran, Demian Kosofsky and Kevin Lupowitz.  A copy of the '834 patent is attached as Exhibit 1 to this complaint.

2.      The '834 patent is directed generally to accessing records of open orders from an order management system's (OMS's) database at a trading institution, generating non-binding indications from the accessed records of orders, transmitting the non-binding indications to an

electronic trading marketplace (ETM), subsequently determining if an accessed record of order in the OMS's database has changed and, if such accessed record has changed, updating the non-binding indication and transmitting the updated non-binding indication to the ETM.

3.     The '834 patent protects Liquidnet's commercially successful automated method for anonymously negotiating security trades, known in the industry as the "Liquidnet System".

## THE PARTIES

4.     Plaintiff Liquidnet is a Delaware corporation having its principal place of business at 498 7th Avenue, New York, N.Y. 10018.

5.     Defendant ITG, Inc. ("ITG") is a Delaware corporation having its principal place of business at 380 Madison Avenue, 4th Floor, New York, N.Y. 10017.

6.     Defendant The MacGregor Group, Inc. ("MacGregor") is a Delaware corporation having its principal place of business at 321 Summer Street, Boston, Massachusetts 02210-1710. MacGregor is a wholly owned subsidiary of ITG.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under the provisions of 28 U.S.C. §§ 1331 and 1338(a), because this is an action for patent infringement arising under the laws of the United States, including 35 U.S.C. §§ 271 and 281-285.

8.     This Court also has personal jurisdiction over the Defendants under the provisions of 10 *Del. C.* § 3104, because both Defendants (a) are corporate citizens of Delaware, (b) upon information and belief, do business in this judicial district, and/or (c) have committed and continue to commit, or have induced or contributed to and continue to induce or contribute to acts of patent infringement in this judicial district as alleged in this Complaint.

9.     Venue is proper in this judicial district 28 U.S.C. §§ 1391 (b), (c), § 1400 (b).

## COUNT I: ITG'S INFRINGEMENT OF THE '834 PATENT

10.      Defendant ITG markets "Channel ITG," a software product that automatically queries (also referred to as "sweeping") open orders from the OMS's database, generates non-binding indications, transmits the non-binding indications to multiple ITG-operated ETMs, subsequently performs the same query of open orders from the OMS's database, updates the non-binding indications based on the subsequent query and transmits the updated non-binding indications to the ETM.

11.      ITG's software product directly, indirectly, contributorily, and/or by inducement, infringes claims of the '834 patent in this judicial district and elsewhere in the United States, literally and under the doctrine of equivalents.

12.      ITG's infringement of the '834 patent has been, and continues to be, willful, deliberate, intentional and without color of right.

13.      ITG's infringement of the '834 patent will continue unless preliminarily and permanently enjoined.

14.      Plaintiff has suffered irreparable harm by reason of ITG's infringement of the '834 patent, including, *inter alia*, the erosion of Plaintiff's statutory right to exclude others form practicing the claimed invention of the '834 patent.

15.      Plaintiff is entitled to all damages adequate to fully compensate Plaintiff for ITG's willful infringement of the '834 patent.

## COUNT II: MACGREGOR'S INFRINGEMENT OF THE '834 PATENT

16.      MacGregor develops, licenses to third-parties, implements and operates the MacGregor XIP OMS, an OMS that is integrated with the "Channel ITG" software product. MacGregor also develops, or assists ITG in developing, an interface between the MacGregor

XIP OMS and one or more ETMs operated by ITG, wherein such interface automatically queries (also referred to as "sweeping") open orders from the OMS's database, generates non-binding indications, transmits the non-binding indications to multiple ITG-operated ETMs, subsequently performs the same query of open orders from the OMS's database, updates the non-binding indications based on the subsequent query and transmits the updated non-binding indications to the ETM.

17.    MacGregor has directly, indirectly, contributorily, and/or by inducement, infringed claims of the '834 patent in this judicial district and elsewhere in the United States, literally and under the doctrine of equivalents.

18.    MacGregor's infringement of the '834 patent has been, and continues to be, willful, deliberate, intentional, and without color of right.

19.    MacGregor's infringement of the '834 patent will continue unless preliminarily and permanently enjoined.

20.    Plaintiff has suffered irreparable harm by reason of MacGregor's infringement of the '834 patent, including, *inter alia*, the erosion of Plaintiff's statutory right to exclude others form practicing the claimed invention of the '834 patent.

21.    Plaintiff is entitled to all damages adequate to fully compensate Plaintiff for MacGregor's willful infringement of the '834 patent.

## DEMAND FOR JURY TRIAL

22.    Plaintiff requests a jury trial under Fed. R. Civ. P. 38 on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

A.     That Defendants have infringed claims of the '834 patent literally and/or under the doctrine of equivalents;

B.     That the Defendants and their respective agents, servants, officers, directors, employees and all persons acting in concert with them, directly or indirectly, be preliminarily and permanently enjoined from infringing, inducing others to infringe, or contributing to the infringement of the '834 patent;

C.     That the Defendants be ordered to account for and pay to Plaintiff the damages to which Plaintiff is entitled as a consequence of the infringement of the '834 patent in an amount no less than a reasonable royalty for the use made of the invention by Defendants;

D.     That such damages be trebled for the willful, deliberate and intentional infringement by Defendants as alleged in this Complaint in accordance with 35 U.S.C. § 284;

E.     That this be found an "exceptional" case and that the Plaintiff be awarded prejudgment interest, costs, disbursements and attorneys' fees in accordance with the provisions of 35 U.S.C. § 285; and

F.     That Plaintiff be awarded such other and further relief as this Court may deem just, proper and equitable.

OF COUNSEL:

Michael A. Nicodema
Barry J. Schindler
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, N.Y. 10166
Tel.: (212) 801-9200
Fax: (212) 801-6400

**GREENBERG TRAURIG, LLP**

By: _____
Donald J. Detweiler (#3087)
Titania R. Mack (#4120)
The Nemours Building
1007 North Orange Street
Suite 1200
Wilmington, Delaware 19801
Tel.: (302) 661-7000
Fax: (302) 661-7360

*Attorneys for Plaintiff Liquidnet, Inc.*

Dated: November 21, 2006

# EXHIBIT 1
## TO COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL



US007136834B1

(12) **United States Patent**
     Merrin et al.

(10) **Patent No.:     US 7,136,834 B1**
(45) **Date of Patent:        Nov. 14, 2006**

(54) **ELECTRONIC SECURITIES MARKETPLACE HAVING INTEGRATION WITH ORDER MANAGEMENT SYSTEMS**

(75) Inventors: **Seth I. Merrin**, New York, NY (US);
     **John Halloran**, New York, NY (US);
     **Demian Kosofsky**, Redmond, WA
     (US); **Kevin Lupowitz**, New York, NY
     (US)

(73) Assignee: **Liquidnet, Inc.**, New York, NY (US)

( * ) Notice:    Subject to any disclaimer, the term of this
                 patent is extended or adjusted under 35
                 U.S.C. 154(b) by 175 days.

(21) Appl. No.: 09/834,171

(22) Filed:     **Apr. 12, 2001**

**Related U.S. Application Data**

(60) Provisional application No. 60/242,373, filed on Oct.
     19, 2000.

(51) **Int. Cl.**
     *G06Q 40/00*          (2006.01)
(52) **U.S. Cl.** ...................................................... **705/37**
(58) **Field of Classification Search** .................. 705/37
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,573,747 | A | * | 4/1971 | Adams et al. ................ 705/37 |
| 4,412,287 | A | | 10/1983 | Braddock, III ............ 364/408 |
| 4,674,044 | A | | 6/1987 | Kalmus et al. ............ 364/408 |
| 4,903,201 | A | | 2/1990 | Wagner ...................... 364/408 |
| 5,101,353 | A | * | 3/1992 | Lupien et al. .............. 705/37 |
| 5,136,501 | A | | 8/1992 | Silverman et al. ........ 364/408 |
| 5,297,031 | A | * | 3/1994 | Gutterman et al. ........ 705/37 |
| 5,497,317 | A | | 3/1996 | Hawkins et al. .......... 364/408 |
| 5,787,402 | A | | 7/1998 | Potter et al. ................ 705/37 |
| 5,809,483 | A | | 9/1998 | Broka et al. ................. 705/37 |
| 5,924,082 | A | * | 7/1999 | Silverman et al. .......... 705/37 |
| 5,924,083 | A | | 7/1999 | Silverman et al. .......... 705/37 |
| 5,926,801 | A | | 7/1999 | Matsubara et al. .......... 705/37 |
| 5,950,176 | A | | 9/1999 | Keiser et al. ................. 705/37 |
| 6,029,146 | A | | 2/2000 | Hawkins et al. ............. 705/35 |
| 6,058,379 | A | | 5/2000 | Odom et al. ................. 705/37 |
| 6,112,189 | A | * | 8/2000 | Rickard et al. .............. 705/37 |
| 6,131,087 | A | | 10/2000 | Luke et al. .................. 705/26 |
| 6,134,535 | A | | 10/2000 | Belzberg ...................... 705/37 |
| 6,141,653 | A | | 10/2000 | Conklin et al. .............. 705/80 |
| 6,157,918 | A | | 12/2000 | Shepherd ...................... 705/37 |
| 6,195,647 | B1 | * | 2/2001 | Martyn et al. ............... 705/37 |
| 6,247,000 | B1 | * | 6/2001 | Hawkins et al. ............. 705/37 |
| 6,278,982 | B1 | * | 8/2001 | Korhammer et al. ......... 705/37 |
| 6,313,833 | B1 | * | 11/2001 | Knight ........................ 715/764 |
| 6,401,080 | B1 | * | 6/2002 | Bigus et al. ................. 705/37 |
| 6,408,282 | B1 | * | 6/2002 | Buist .......................... 705/37 |
| 6,418,419 | B1 | * | 7/2002 | Nieboer et al. .............. 705/37 |

(Continued)

FOREIGN PATENT DOCUMENTS

JP      02004287893 A    *  10/2004

OTHER PUBLICATIONS

Microsoft Press Computer Dictionary, Third Edition, 1997, p. 456.*

(Continued)

*Primary Examiner*—Charles R. Kyle
(74) *Attorney, Agent, or Firm*—Greenberg Traurig LLP

(57)                    **ABSTRACT**

An electronic trading marketplace (ETM) communicates
with interfacing modules interfacing directly with order
management systems (OMS's) at trading institutions. The
interfacing modules automatically transmit orders from the
OMS databases to the ETM and update the OMS databases
in response to orders executed at the ETM. Traders can
communicate with the ETM to anonymously negotiate
trades of securities.

**12 Claims, 8 Drawing Sheets**



# US 7,136,834 B1
## Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,421,653 B1 * | 7/2002 | May ........................ | 705/36 R |
| 6,493,683 B1 * | 12/2002 | David et al. ................. | 705/37 |
| 6,505,175 B1 * | 1/2003 | Silverman et al. ............ | 705/37 |
| 2002/0007335 A1 * | 1/2002 | Millard et al. ............... | 705/37 |
| 2002/0052824 A1 * | 5/2002 | Mahanti et al. .............. | 705/37 |
| 2002/0055901 A1 * | 5/2002 | Gianakouros et al. ........ | 705/37 |
| 2003/0050888 A1 * | 3/2003 | Satow et al. ................. | 705/37 |
| 2004/0199453 A1 * | 10/2004 | Brady et al. ................. | 705/37 |
| 2006/0015446 A1 * | 1/2006 | Burkhardt et al. ........... | 705/37 |
| 2006/0136326 A1 * | 6/2006 | Heckman et al. ............. | 705/37 |

### OTHER PUBLICATIONS

Davis J, Business 2.0, Big Storm Rising, Sep. 1, 1998. 2 pages.*
Svaidi, Denver Business Journal, Wall Street Turns to Durango for Help, Feb. 2, 1998, 3 pages.*
Macgregor, "*About Us*" retrieved from website www.macgregor/wssotecpmtemtabpitabpit/asp? Aug. 10, 2001.

* cited by examiner



**FIG.1**



FIG.2



FIG.3



FIG.4



FIG.5



FIG.6



FIG.7



FIG.8



**FIG.9**

US 7,136,834 B1

1

# ELECTRONIC SECURITIES MARKETPLACE HAVING INTEGRATION WITH ORDER MANAGEMENT SYSTEMS

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application No. 60/242,373, filed Oct. 19, 2000, which is hereby incorporated by reference herein.

## BACKGROUND

### 1. Field of the Invention

The present invention relates in general to securities trading and in particular to electronic commerce marketplaces and order management systems for supporting securities trading.

### 2. Background Art

Although computers are heavily used to facilitate trading of securities, manual intervention is still required at certain steps in the trading process. For example, most traders at institutional investment management firms record their orders to purchase or sell securities in computerized order management systems (OMS's). However, one or more traders at each firm must manually review the orders in the OMS and attempt to fill the orders by contacting one or more market intermediaries. Typically, the traders transmit the orders in the OMS by telephone or separate data entry links to registered broker-dealers for the securities, to electronic marketplaces that trade the securities, or to other market intermediaries. Accordingly, manual effort is required to actually execute the orders in the OMS.

One problem arising from this manual effort is that institutional traders cannot execute trades involving large quantities of securities without adversely affecting the market price of the securities. For example, institutional traders often need to trade large quantities of securities due to the continuing need of investment managers to respond to changes in market conditions by altering the contents of their investment portfolios. As these portfolios increase in size due to increased investor activity, the corresponding quantity of securities to be traded in order to achieve a similar portfolio balance also increases. Market impact costs, or adverse costs resulting from the institutional traders' activities, rise in such circumstances because locating parties with whom to trade such large quantities of securities becomes more difficult for the market intermediaries.

Moreover, if the market intermediaries become aware that an institutional firm wants to, say, sell a large block of a particular equity security, this awareness is likely to lower the sale price that the institutional firm can obtain due to the normal processes of supply and demand. The effect is also likely to be exacerbated by speculation from others with knowledge of the order as to why the particular investor wishes to sell such a large quantity of the security. Similarly, if market intermediaries become aware of the fact than an institutional firm wants to buy a large block of a particular equity security, this awareness will likely increase the purchase price that the institutional firm will have to pay. This adverse effect on price is further exacerbated by the fact that traditional market intermediaries trade for their own accounts.

One strategy commonly employed by institutional traders to offset market impact costs is to spread out trade orders for a large quantity of a security into small orders each handled by a different market intermediary, sometimes over several

2

trading days. Of course, this strategy brings about its own problems in that the market price can change significantly during this extended trading period due to the unforeseeable activities of others.

Another strategy that may be employed is to spread the orders for the security among one or more electronic marketplaces. However, the traders must manually transmit each order to the electronic marketplaces using a telephone or a separate data entry link. The fact that the traders need to perform these extra steps, which include duplicate entry of basic order data already recorded in the OMS, causes many traders to use these electronic marketplaces infrequently, and to supply the marketplaces with only a small subset of the total orders. As a result, these electronic marketplaces often lack the liquidity required by a trader to timely execute orders.

The lack of integration between the OMS and the electronic marketplaces also poses problems when an institutional trader wishes to trade a particular security simultaneously within an electronic marketplace and, for example, over the telephone with a traditional broker. For example, some electronic marketplaces attempt to find matches at only specific time intervals. If a trader wishes to buy 100,000 shares of IBM, and has placed an order for half that amount in an electronic marketplace, the trader will not know how much, if any, IBM stock was purchased until after the next scheduled match attempt. In the meantime, the trader potentially could have purchased more than 50,000 shares from a broker over the phone at a better price.

Therefore, there is a need in the art for an electronic trading marketplace that does not require any manual intervention by traders or other parties, offers anonymity, and offers a high amount of liquidity.

## DISCLOSURE OF THE INVENTION

The present invention addresses the above need by providing for the automated transmission of orders (i.e., without manual trader intervention) from the various order management systems (OMS's) used by investment management firms or other entities having trading systems to an electronic trading marketplace (ETM). A firm with a trading system stores information about orders in an OMS to manage its order flow, to monitor the initiation, placement, and execution of orders, and for related purposes. Software providing the functionality of an OMS is well known in the art.

OMS interfacing modules (OIMs) at the firms automatically transmit orders from the OMS's to the ETM and preferably update the OMS's in response to orders executed at the ETM. Traders can communicate with the ETM to anonymously negotiate trades of securities. As used herein, a "security" is an ownership or creditorship interest, such as a stock certificate, bond, or any other financial instrument, contract or transaction, such as a forward, futures, option, put, call, collar, swap, or currency contract on any security. This description uses the term "security" for convenience but it should be understood that the term covers financial instruments generally.

The ETM includes an OMS data integration module (ODIM) for receiving and processing data representative of orders received from the OIMs. In a preferred embodiment, the data from the OIMs are provided to the ETM in a standardized format that requires little processing by the ODIM. The orders processed by the ODIM are stored in an ETM database.

US 7,136,834 B1

**3**

A negotiation module in the ETM supports negotiations between traders. In one embodiment, an indications module transmits orders received by the ETM among the traders based upon filtering criteria established by the traders and/or the ETM. These orders are transmitted among the traders in the form of non-binding indications. Based upon these indications, traders at one institution can enter into negotiations with traders at other institutions, through the negotiation module of the ETM. In one embodiment, at least parts of the negotiations are conducted anonymously.

A trader authentication module authorizes and authenticates traders who log into the ETM in order to perform trading negotiations and/or other functions. A transaction history module records transactions performed by the ETM in the ETM database. The transaction history module also preferably records other data processed by the ETM including, for example, the orders received from and sent to the trading systems and the conducted negotiations.

A typical trading system at an investment management firm or other entity at which trading is performed includes a number of workstations coupled to an OMS server via a network, with a trader at each workstation. Each workstation preferably executes a trader OMS interaction module (TOIM) for facilitating interactions between the trader's workstation and the OMS server. In one embodiment of the present invention, the TOIM allows a trader to add, delete, or modify open or contemplated orders stored in the OMS database. The OMS, which includes the OMS server, OMS database, and TOIM, is typically provided by an OMS vendor, though some firms have developed their own OMS's.

In connection with the present invention, each workstation also preferably executes an ETM interaction module (EIM) for facilitating interactions with the ETM. The EIM allows a trader to send information to the ETM and view and respond to information received from the ETM. Typically, this information includes information about the trader's indications, information about other traders' indications, and orders transmitted to and received by a trader during a negotiation.

The OMS database holds data representative of open, contemplated, or completed orders to buy and/or sell securities by traders using the trading system. The OIM is in communication with the OMS database and the ETM. An OMS database integration module in the OIM reads data records stored in the OMS database and, in a preferred embodiment, also creates and modifies data records stored in the OMS database upon execution of a trade through the ETM. In one embodiment, the OMS database interaction module directly accesses the OMS database and in another embodiment it sends commands to an application programming interface (API) in the OMS for accessing the database.

The OIM also includes an ETM communication module for communicating with the ETM. In one embodiment, the ETM communication module provides selected data records in the OMS database to the ETM and, in a preferred embodiment, receives data and/or instructions from the ETM regarding changes to make to the OMS database. In addition, the OIM preferably includes a data record conversion module for modifying the format of data records sent to the ETM and/or received from the ETM. The OIM also preferably includes a filtering module for filtering out specified orders by security type, security name, order type, order price, order quantity, or other category, so that those orders are not transmitted to the ETM.

Preferably, the OIM transmits to the ETM data records in the OMS database relating to a trader's orders when the

**4**

trader logs on to the ETM. Once the OIM determines that the trader has logged on to the ETM, the OIM retrieves data records about that trader's orders suitable for transmission to the ETM from the OMS database. In one embodiment, the OIM converts the data records retrieved from the OMS database into a standardized format understood by the ETM. In another embodiment, this functionality is part of the ETM.

After a trader has logged on to the ETM, the OIM determines whether the contents of the OMS database have changed. If the OMS database has changed, the OIM determines whether the change should be transmitted to the ETM. In one embodiment, the OIM continues to determine whether the contents of the OMS database have changed between the time that a trader logs on to the ETM and the time that the ETM commences trading. In another embodiment, the OIM does not commence making this determination until the time that the ETM commences trading.

Because typical OMS's are complex and multi-featured, and because securities of types not handled by the ETM may be traded using the OMS, some changes to the OMS database do not necessitate a transmission of updated data to the ETM. The OIM preferably transmits changes to the database to the ETM if the changes represent new or modified orders.

The OIM preferably updates the database in response to information received from the ETM indicating executed trades or other information. In a preferred embodiment, if an execution occurred in the ETM involving an order in the OMS associated with the OIM, the OIM receives information from the ETM describing the execution. This information includes, for example, the type, amount, and price of securities traded, the time of execution, and/or information identifying the original order in the OMS database on which the execution was based. The OIM converts the received information about the execution into the format used by the OMS and updates the OMS database accordingly. As a result of these steps, the OMS is updated automatically and transparently to reflect executions performed at the ETM. The executions appear to the OMS as typical trades conducted at another broker, so no special functionality needs to be added to the OMS in order to interact with the ETM beyond that functionality described herein.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high-level block diagram illustrating an electronic trading marketplace (ETM) environment according to an embodiment of the present invention;

FIG. 2 is a high-level block diagram illustrating more details of the ETM;

FIG. 3 is a lower-level block diagram illustrating a trading system like those illustrated in FIG. 1;

FIG. 4 is a diagram illustrating a data record stored in the order management system (OMS) database to identify an order according to one embodiment of the present invention;

FIG. 5 is a diagram illustrating a placement record preferably stored in the OMS database to indicate a placement of an order at a particular venue;

FIG. 6 is a diagram illustrating an execution record preferably stored in the OMS database to indicate the execution of an order;

FIG. 7 is a flow diagram illustrating actions performed by an embodiment of the present invention when a trader logs on to the ETM;

US 7,136,834 B1

5

6

FIG. 8 is a flow diagram illustrating actions performed by an embodiment of the present invention after a trader has logged on to the ETM; and

FIG. 9 is a flow diagram illustrating actions performed by a preferred embodiment of the present invention when the OMS database is updated in response to a trade executed by the ETM.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

FIG. 1 is a high-level block diagram illustrating an electronic trading marketplace (ETM) environment according to an embodiment of the present invention. An ETM 110 is in communication with three trading systems 112A, 112B, 112C. Although only three trading systems 112 are illustrated, embodiments of the present invention can have many more (or fewer) trading systems 112 in communication with the ETM 110. FIG. 1 illustrates only three trading systems 112 in order to enhance the clarity of this description.

The trading systems are used by investment management firms or other entities that have established a relationship with the ETM 110. The trading systems 112 communicate with the ETM 110 to facilitate the trading of securities. As used herein, a "security" is any ownership or creditorship interest, such as a stock certificate or bond, or any other financial instrument, contract, or transaction, such as a forward, futures, option, put, call, collar, swap, or currency contract. This definition includes, for example, any note, stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral trust certificate, investment contract, voting-trust certificate, certificate of deposit, any put, call, straddle, option, or privilege on any of the foregoing, or group or index of securities (including any interest therein or based on the value thereof). This list is not all-inclusive. For purposes of clarity, this description will describe the trading of stock.

Within each trading system 112 is a database 114A, 114B, 114C associated with an order management system (OMS). Each OMS database 114 holds data representative of open, contemplated, or completed orders to buy and/or sell securities (collectively referred to herein as "orders for securities") by traders using the trading system 112. For example, assume that the database 114A of trading system 112A contains orders to sell 50,000 shares of DELL and 75,000 shares of MSFT and orders to buy 25,000 shares of CPQ and 100,000 shares of IBM. Also assume that the database 114B of trading system 112B contains orders to sell 30,000 shares of CPQ and buy 62,000 shares of T.

The orders in the OMS databases 114 are automatically transmitted to the ETM 110. Likewise, any changes in the orders, such as modifications and/or withdrawals, are automatically transmitted to the ETM 110. As used herein, the term "automatically" means that the associated action is performed without any human or manual intervention. Thus, there is no need for traders to specifically request that individual orders in the OMS databases 114 are transmitted to the ETM 110; orders in the databases are sent to the ETM 110 without the traders' input (subject to filtering criteria).

Preferably, the ETM 110 anonymously transmits information about a trader's orders to other traders using the ETM, subject to filtering in accordance with filtering criteria established by the traders and/or the ETM. Moreover, the ETM 110 preferably manages anonymous negotiations between traders using the trading systems 112 for the purpose of executing the orders and sends data about the completed trades to the OMS's of the traders involved in the transaction.

Thus, one embodiment of the present invention selectively broadcasts information about the orders received by the ETM 110 from the database 114A of trading system 112A to the other trading systems 112B, 112C. Likewise, the ETM 110 selectively broadcasts information about the orders received from the database 114B of trading system 112B to the other trading systems 112A, 112C. If the traders desire such a trade, the ETM 110 will facilitate the anonymous negotiation and sale of 25,000 shares of CPQ from a trader using trading system 112B to a trader using trading system 112A.

Data is communicated between the trading systems 112 and the ETM 110 using interfacing links 116A, 116B, 116C. Any known interfacing technologies can be used to effectuate these links, including, but not limited to, transmission control protocol/Internet protocol (TCP/IP), satellite, cellular, and/or radio frequency (RF) links, or some combination thereof. The links may pass through one or more intermediate data processing systems, such as telephone switches or Internet servers, before reaching the ETM 110 or a trading system 112. In embodiments where data travels over shared links, such as embodiments where data travels over the public Internet, the data is preferably encrypted using a secure protocol, such as the secure sockets layer (SSL).

FIG. 2 is a high-level block diagram illustrating more details of the ETM 110. Those of skill in the art will recognize that FIG. 2 illustrates only one possible embodiment of the ETM 110. Obviously, different combinations of hardware and software can be used to provide the functionality of the ETM 110 described herein.

Data received by the ETM 110 from the trading systems 112 over the interfacing links 116 are received by a firewall 210. As is known in the art, the firewall 210 preferably prevents unauthorized users from gaining access to the rest of the ETM 110 and monitors transfers of data to and from the network.

Data that pass through the firewall 210 are received by one or more modules that perform the functionality of the ETM 110. As used herein, the term "module" refers to machine-executable code and/or data, but may also include associated circuitry, such as processing circuitry, as well as data storage areas, and/or any other software or hardware. Thus, it will be appreciated that one or a combination of hardware and software, such as a computer system executing software for performing the functionality of the modules, may implement each of the modules shown in FIG. 2. It will also be appreciated by those skilled in the art that the ETM 110 may comprise one or more other types of modules, circuitry, etc., not shown in FIG. 2 in order to avoid unnecessarily obscuring understanding of the invention. For instance, the ETM 110 may include one or more microprocessors, network connection circuitry, and/or data storage areas, such as read-only memory (ROM), random-access memory (RAM), CDROM, DVD, tape drive, hard disk (HD), and/or other types of storage areas. It will also be appreciated that the functionality of multiple modules described herein can be combined into a single module and the functionality of a single module can be split or shared among multiple modules. Moreover, alternative embodiments of the present invention can lack one or more of the modules described herein and/or have modules not described herein.

The ETM 110 preferably includes an OMS data integration module (ODIM) 212. The ODIM 212 receives and

US 7,136,834 B1

7

processes data representative of orders received from the OMS databases 114 in the trading systems 112. In a preferred embodiment, the data from the OMS databases 114 are provided to the ETM 110 in a standardized format that requires little processing by the ODIM 212. In an alternative embodiment, the data from the OMS databases 114 are provided to the ETM 110 in one or more different formats depending upon factors such as the type of OMS used by the trading systems 112, the types of interfacing links supplying the data to the ETM, the type of security or orders to which the data pertains, and the like. In this latter embodiment, the ODIM 212 preferably converts the data into a standardized format for use by other modules in the ETM 110.

The orders processed by the ODIM 212 are stored in an ETM database 214. Data in the database 214 are preferably accessible to the other modules in the ETM 110. In addition, the other modules in the ETM 110 can store other data in the illustrated database 214 or other databases as may be required during normal operation.

In a preferred embodiment, an indications module 216 transmits information about orders received by the ETM 110 among the various traders based upon filtering criteria established by the traders and/or the ETM 110. This information is transmitted among the traders in the form of non-binding indications.

Based upon these indications, traders can enter into negotiations with other traders through a negotiation module 218. The negotiation module 218 facilitates negotiations between traders using trading systems and having contra interests. In one embodiment, at least parts of the negotiations are conducted anonymously, in order to limit the spread of information about the traders' activities.

A market data module 220 receives real-time and other market data from an input 222. The market data module 220 provides the market data to the negotiation module 218 and to the traders. The traders preferably use the market data during the negotiations to determining market prices for the securities.

A transaction history module 224 records transactions performed by the ETM 110 in the database 214. The transaction history module 224 also preferably records other data processed by the ETM 110 including, for example, information about orders received from and sent to the trading systems 112 and the negotiations conducted (successful or not). This module 224 is preferably used to audit the transactions conducted on the ETM 110.

A trader authentication module 226 authorizes and authenticates traders who log into the ETM 110 in order to perform trading negotiations and/or other functions. In one embodiment, the trader authentication module 226 stores authentication information, such as a login ID/password pair in the database 214. The trader authentication module 226 also preferably stores profiles for the registered traders.

Other modules that may be present in the ETM 110 include load monitoring modules for monitoring the load on various servers comprising the ETM, fault tolerance modules for providing fault tolerance to the ETM, security modules for preventing and detecting security violations on the ETM, and back office modules for providing back office functionality. These modules are not shown in FIG. 2 in order to avoid unnecessarily complicating the figure.

FIG. 3 is a lower-level block diagram illustrating a trading system 112 like those illustrated in FIG. 1. Those of ordinary skill in the art will recognize that FIG. 3 illustrates only one possible embodiment of a trading system 112 and alternative embodiments of the trading system exist. FIG. 3 illustrates three workstations 310A, 310B, 310C coupled to an OMS

8

server 312 via a network 314. The workstations 310 are preferably general- or specific-purpose computer systems executing specialized software for facilitating trading of securities. Although only three workstations 310 are illustrated, a trading system 112 can have any practical number of workstations.

In a typical trading system that interacts with the ETM 110, each workstation 310 executes a trader OMS interaction module 316 (TOIM) for facilitating interactions with the OMS server 312. In this typical trading system, the TOIM 316 allows a trader to add, delete, or modify open or contemplated orders stored in the OMS database 114. Contemplated orders may be stored in the OMS database 114, for example, because the trader intends to execute certain transactions in stages, or because the contemplated transactions are desirable only if the market prices of the securities to be traded are within a certain range (e.g., limit orders). Therefore, such orders serve as placeholders indicating the total quantity of a security that a trader wishes to transact and conditions for transacting other orders; other data in the database 114 indicate the quantity of the security that has been transacted to date.

Each workstation 310 executes an ETM interaction module 318 (EIM) for facilitating interactions with the ETM 110. In alternative embodiments of the present invention, the EIM 318 is incorporated into the TOIM 316 or other modules on the workstation 310. The EIM 318 allows a trader to send information to the ETM 110 and view and respond to information received from the ETM 110. Typically, the received information includes information about orders (through the indications module 216) and orders (through the negotiation module 218) that the ETM 110 receives from other traders or trading institutions. The trader uses the EIM 318 to enter into and transact negotiations to buy and/or sell securities through the ETM 110.

The network 314 connects the workstations 310 to the OMS 312 and to external networks such as the network in communication with the ETM 110. The network 314 can utilize any networking technology that supports bi-directional transfer of data among the OMS 312, workstations 310, and external networks. In a typical embodiment, the network 314 is a private local area network (LAN) installed at a financial institution and interfacing with one or more external gateways. In alternate embodiments, the network may be wireless, connect devices over a wide area, and/or at least partially carry data over a public network (such as the Internet). Other network components, such as a firewall, may also be present. Those of ordinary skill in the art will recognize that many different types of networks can perform the functionality described herein.

The OMS 312 is preferably comprised of one or more computer systems for executing and maintaining an order management system. The OMS 312 receives instructions from the workstations to create, modify, and/or delete orders and updates the database 114 accordingly. Software providing the functionality of the OMS 312 is well known in the art. Commercial OMS software packages are available from The MacGregor Group, Eze Castle Software, Advent Software, and Decalog, to name but a few. In addition, some trading institutions utilize custom OMS software.

As described above, the database 114 holds data representative of open, contemplated, or completed orders to buy and/or sell securities. FIG. 4 is a diagram illustrating a data record 400 stored in the database 114 to identify an order according to one embodiment of the present invention. Different OMS systems utilize different order data records and, therefore, it should be understood that FIG. 4 illustrates

US 7,136,834 B1

9

only one possible data record. However, many OMS systems store the same general information and the illustrated order data record **400** is intended to represent a typical order data record for an OMS system.

The order data record **400** has multiple fields, each field holding different information about an order. The Order ID field **410** preferably holds a value uniquely identifying the order associated with the data record **400**. Similarly, the Trader ID field **412** preferably holds a value uniquely identifying the trader or other person who placed the order. The Order Status field **414** identifies whether the order is open, contemplated, completed, canceled, or any other possible status. The next field, Order Last Update Time **416**, preferably holds a timestamp that identifies the last time that the data record **400** was modified in any way. This field **416** is useful for determining whether the most recent version of the data record **400** has been considered.

The Transaction Type field **418** preferably indicates whether the data record **400** corresponds to an order to buy or sell a security. The Security Symbol field **420** preferably uniquely identifies the security to be transacted. The Security Symbol field **420** can hold, for example, a Committee on Uniform Securities Identification Procedures (CUSIP) number, a ticker symbol, or any other identifier of the security. The Security Type field **422** is preferably used to interpret the other data in the data record **400** according to the given security type. For example, treasury bills are priced in terms of a discount to face value; inherent in the pricing formula is the yield that would be obtained if the bill were held to maturity. In contrast, equity securities are priced in actual per-share values. The information in the Security Type field **422** can also be used to filter out certain types of securities.

The Order Type field **424** preferably indicates whether the order is a market or a limit order, although the field can also indicate other order types. If the order is a limit order, the Limit Price Field **426** preferably identifies the price set by the trader.

The Total Order Size field **428** preferably identifies the actual number of shares that the trader desires to transact. The Quantity Placed Elsewhere field **430** is a value either equal to or less than the value in the Total Order Size field **428**. In an embodiment of the present invention, the ETM **110** uses the values of these two fields **428**, **430** to determine a quantity of a security, if any, that are available to be transacted by the ETM.

Preferably, the OMS **312** allows for the possibility that trading a large quantity of a given security may occur over several days at several different venues. For example, to fill an order to buy 1,000,000 shares of IBM, a trader may need to place an order for 300,000 shares with one broker, and record numerous executions of portions thereof until the full 300,000 shares placed with that broker are purchased. If the broker cannot provide additional shares at a suitable price, the trader may then place an additional quantity, up to the 700,000 shares remaining to be purchased, via another broker, electronic marketplace, or other venue. Preferably, the broker enters a placement record into the OMS database **114** to indicate that the trader anticipates executing a portion of the order through the second venue. This second venue may also fill the quantity it was asked to provide in several executions. Thus, an order can have one or more placements and each placement can have one or more executions associated with it.

FIG. 5 is a diagram illustrating a placement record **500** preferably stored in the OMS database **114** to indicate a placement of an order at a particular venue. The Order ID field **510** preferably holds a value that uniquely identifies the

10

order associated with the placement. The Order ID field **510** ties the placement information to the overall order. Thus, all placements for the same order preferably have the same value in this field **510**. The Broker field **512** preferably contains an alphanumeric value identifying the venue associated with the placement. Lastly, the Quantity Placed with Broker field **514** preferably lists the portion of the total order size that is placed for fulfillment through the venue.

When a transaction is executed in a specified venue, such as the ETM **110**, a corresponding execution record is preferably stored in the OMS database **114** via the network **314** or a direct connection. In alternative embodiments, the OIM **320** is in communication with the OMS **312** and/or the workstations **310**. The OIM **320** is also in communication with the ETM **110** via an external gateway or some other form of network connection. In another alternative embodiment, the OIM **320** is integrated into the ETM **110** and is remote from the OMS **312**, although some functionality is present at the OMS in order to provide OMS data to the OIM.

In a preferred embodiment, the OIM **320** includes a computer system storing and executing software for performing the functionality described herein. In an alternative embodiment, the OIM **320** executes on the same computer system as the OMS **312**. In one embodiment, the OIM **320** includes an OMS database interaction module **322** for interacting with the OMS database **114**. The OMS database interaction module **322** reads records stored in the OMS database **114** and, in a preferred embodiment, creates and modifies data records stored in the OMS database **114**. In one embodiment, the OMS database interaction module **322** directly accesses the OMS database **114** and in another embodiment it sends commands to an applications programming interface (API) in the OMS **312** for accessing the database.

The OIM **320** also preferably includes an ETM communication module **324** for communicating with the ETM **110**. In one embodiment, the ETM communication module **324** automatically provides selected data records in the OMS database **114** to the ETM **110** and, in a preferred embodiment, receives data and/or instructions from the ETM. In addition, the OIM **320** also preferably includes a data record conversion module **326** for modifying the format of the data records sent to and/or received from the ETM **110** and a filtering module **238** for filtering out specified orders by security type, security name, order type, order quantity, order price, or some other factor or category, so that filtered orders are not transmitted to the ETM.

FIG. 7 is a flow diagram illustrating actions performed by an embodiment of the present invention when a trader logs on to the ETM **110**. Although the actions of FIG. 7 and

US 7,136,834 B1

11

subsequent figures are attributed herein to the OIM 320, one of ordinary skill in the art will recognize that all or some of the actions can be carried out by other entities.

Preferably, the OIM 320 waits 710 until a trader logs on to the OMS 312 before transmitting data records for that trader to the ETM 110. In one embodiment, the ETM 110 sends a message to the OIM 320 when a trader at the institution in which the OIM 320 resides logs into the ETM. The OIM 320 interprets this message as a sign to commence receiving orders. In other embodiments of the present invention, the OIM 320 uses other techniques, such as querying the OMS database 114 for specific entries, listening for an inter-process message sent by the OMS 312, polling individual trader workstations 310, or implementing a timer-based algorithm, to determine that a trader has logged on to the OMS 312.

Once a determination is made that a trader has logged on to the OMS 312 the OIM 320 retrieves 712 data records about orders suitable for transmission to the ETM from the OMS database 114. In one embodiment of the present invention, all open orders are suitable for transmission to the ETM 110. In other embodiments of the present invention, the OIM 320, through the filtering module 328, makes the determination of suitable orders based on other criteria, such as the security type (e.g., stock or bond), security name (e.g., IBM or T), order type (e.g., market or limit order), order quantity, and/or order price.

If necessary, the data record conversion module 326 within the OIM 320 preferably converts 714 the data records retrieved from the OMS database 114 into a standardized format understood by the ETM 110. As described above, the functionality of the data record conversion module 326 can also be performed by the ODIM 212 in the ETM 110. Alternative embodiments of the present invention may send the data records individually or in multiple batches. The data transmitted to the ETM 110 depend on factors such as the types of securities being traded, and/or the fields required in order to accurately trade such securities.

FIG. 8 is a flow diagram illustrating the actions performed by an embodiment of the present invention after a trader has logged on to the OMS during the trading day. The actions of FIG. 8 are preferably automatically performed multiple times during the trading day. Initially, the OIM 320 determines 810 whether the contents of the OMS database 114 have changed. The OIM 320 can perform this step by, for example, polling the database 114 at regular, near-real-time intervals, querying the database for contents of specified fields such as timestamps, and/or listening for network or specific interprocess communication message traffic.

If the database has changed, the OIM 320 preferably determines whether the change should be transmitted to the ETM 110. Because typical OMS's are complex and multi-featured, and because securities of types not handled by the ETM 110 may be traded using the OMS 312, some changes to the OMS database 114 do not necessitate a transmission of updated data to the ETM 110. Thus, the OIM 320 determines 812 whether the change to the database 114 reflects a new order of a type that is traded in the ETM 110. If so, then the OIM 320 retrieves 816 the pertinent data for the order from the database 114. If the change does not reflect a new order, then the OIM 320 preferably determines 814 whether the database change pertains to a modification of an existing order that has already been sent to the ETM 110. If so, the OIM 320 retrieves 818 the data records corresponding to the modified order from the database 114. Once the appropriate data records, if any, are retrieved from the database, the OIM 320 preferably converts 820 the data

12

records into the appropriate format and transmits the records to the ETM 110 as described above with respect to FIG. 7.

FIG. 9 is a flow diagram illustrating the actions performed by an embodiment of the present invention when the OMS database 114 is updated in response to a trade executed by the ETM 110. The illustrated steps can be performed each time a trade is executed, or in batch. However, the steps are preferably performed frequently enough so that the OMS database 114 is updated in substantially real-time.

The OIM 320 initially determines 910 whether an execution occurred in the ETM 110 involving an order in the OMS 312 associated with the OIM. The step may be performed, for example, by receiving a message from the ETM 110 identifying a particular execution that occurred at the ETM, by filtering a list of all executions or other data from the ETM for executions listed in the OMS 312, or by periodically polling the ETM for performed executions.

If an execution occurred in the ETM 110 involving an order in the OMS 312 associated with the OIM 320, the OIM receives 912 information from the ETM describing the execution. This information includes, for example, the type, amount, and price of securities traded, the time of execution, and/or information identifying the original order in the OMS database 114 on which the execution was based. The OIM 320 converts 914 the received information about the execution into the format used by the OMS 312. Then, the OIM 320 updates 916 the OMS database 114 with the converted execution data. As a result of these steps, the OMS 312 is updated automatically and transparently to reflect executions performed at the ETM 110. The executions appear to the OMS 312 as typical trades conducted at another broker.

In summary, the present invention includes an electronic trading marketplace that generates liquidity, at least in part, by receiving order information directly from the databases of OMS systems at trading institutions. Since orders are extracted from the OMS databases automatically, and information about executed orders is inserted into the databases automatically, the OMS databases "see" the marketplace as "just another market intermediary." Moreover, traders are able to conduct trades in the electronic marketplace without any duplicative manual efforts.

The above description is included to illustrate the operation of the preferred embodiments and is not meant to limit the scope of the invention. The scope of the invention is to be limited only by the following claims. From the above discussion, many variations will be apparent to one skilled in the relevant art that would yet be encompassed by the spirit and scope of the invention.

We claim:

1. A computer-implemented method for generating non-binding indications for at least one security comprising:

i) accessing, by at least one computer, all records of open orders from a database of an order management system, wherein the order management system database is associated with a trading firm and wherein the order management system is coupled to at least one workstation utilized by the trading firm and wherein the order management system database comprises at least the following fields:

(a) security name, symbol or identifier,

(b) transaction type,

(c) total order size,

(d) quantity of the security placed elsewhere, and

(e) quantity of the security executed;

ii) generating, by at least one computer, all non-binding indications from the accessed records of orders that are suitable for transmission to at least one electronic

US 7,136,834 B1

**13**

marketplace, each non-binding indication comprising security name, symbol or identifier, the transaction type, and an available quantity, such available quantity being determined by the accessed records;

iii) sending the suitable non-binding indications to the at least one electronic marketplace;

(iv) periodically determining if at least one accessed record of order of the order management system database has changed and, if such accessed record of the order management system database has changed, then subsequently generating, for the changed record of order, at least one updated non-binding indication; and

(v) if updated, subsequently sending the updated non-binding indication to the at least one electronic marketplace.

**2.** The method of claim 1, further comprising matching at least one non-binding indication sent to the electronic marketplace with a contra interest and providing an indication of the match.

**3.** The method of claim 2, further comprising executing a trade based upon the match of the non-binding indication and the contra interest.

**4.** A computer-implemented method for generating non-binding indications for at least one security comprising:

i) accessing, by at least one computer, all records of open orders from a database of an order management system, wherein the order management system database is associated with a trading firm and wherein the order management system is coupled to at least one workstation utilized by the trading firm and wherein the order management system database comprises at least the following fields:

(a) security name, symbol or identifier,

(b) transaction type,

(c) total order size,

(d) quantity of the security placed elsewhere, and

(e) quantity of the security executed;

ii) generating, by at least one computer, all non-binding indications from the accessed records of orders that are suitable for transmission to at least one electronic marketplace, each such non-binding indication comprising security name, symbol or identifier, the transaction type, and an available quantity, such available quantity being determined by the accessed records;

iii) sending the suitable non-binding indications to the at least one electronic marketplace;

(iv) determining if at least one message, reflecting open orders from the order management system, reflects a change of in the order management system and, if such accessed message reflects such change, then subsequently generating, for the changed order, at least one updated non-binding indication; and

(v) if updated, subsequently sending the at least updated non-binding indication to the at least one electronic marketplace.

**5.** The method of claim 4, further comprising matching at least one non-binding indication sent to the electronic marketplace with a contra interest and providing an indication of the match.

**6.** The method of claim 5, further comprising executing a trade based upon the match of the non-binding indication and the contra interest.

**7.** A computer-implemented method for generating non-binding indications for at least one security comprising:

**14**

i) accessing, by at least one computer, at least one message reflecting open orders from an order management system, wherein the order management system is associated with a trading firm and wherein the order management system is coupled to at least one workstation utilized by the trading firm, wherein the order management system comprises at least the following fields:

(a) a security name, symbol or identifier,

(b) transaction type,

(c) total order size,

(d) quantity of the security placed elsewhere, and

(e) quantity of the security executed;

ii) generating, by at least one computer, non-binding indications from the accessed messages reflecting orders that are suitable for transmission to at least one electronic marketplace, each such non-binding indication comprising security name, symbol or identifier, the transaction type, and an available quantity, such available quantity being determined by the accessed messages;

iii) sending the non-binding indications to the at least one electronic marketplace;

(iv) determining if at least one record, reflecting open orders from an order management system, of order of the order management system database has changed and, if such record of the order management system database has changed, then subsequently generating, for the changed record of order, at least one updated non-binding indication; and

(v) if updated, subsequently sending the updated non-binding indication to the at least one electronic marketplace.

**8.** The method of claim 7, further comprising matching at least one non-binding indication sent to the electronic marketplace with a contra interest and providing an indication of the match.

**9.** The method of claim 8, further comprising executing a trade based upon the match of the non-binding indication and the contra interest.

**10.** A computer-implemented method for generating non-binding indications for at least one security comprising:

i) accessing, by at least one computer, at least one message reflecting open orders from an order management system, wherein the order management system is associated with a trading firm and wherein the order management system is coupled to at least one workstation utilized by the trading firm, wherein the order management system comprises at least the following fields:

a) a security name, symbol or identifier,

(b) transaction type,

(c) total order size,

(d) quantity of the security placed elsewhere, and

(e) quantity of the security executed;

ii) generating, by at least one computer, non-binding indications from the accessed messages reflecting orders that are suitable for transmission to at least one electronic marketplace, each such non-binding indication comprising security name, symbol or identifier, the transaction type, and an available quantity, such available quantity being determined by the accessed messages;

iii) sending the suitable non-binding indications to the at least one electronic marketplace;

US 7,136,834 B1

15

(iv) determining if at least one subsequently accessed message reflects a change of order in the order management system and, if such accessed message reflects such change, then subsequently generating, for the changed order, at least one updated non-binding indication; and

(v) if updated, subsequently sending the updated non-binding indication to the at least one electronic marketplace.

16

11. The method of claim 10, further comprising matching at least one non-binding indication sent to the electronic marketplace with a contra interest and providing an indication of the match.

12. The method of claim 11, further comprising executing a trade based upon the match of the non-binding indication and the contra interest.

* * * * *

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Liquidnet, Inc. | ITG, Inc. and The MacGregor Group, Inc. |

| (b) County of Residence of First Listed Plaintiff _____ (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Donald J. Detweiler, Esq.
Titania R. Mack, Esq.
Greenberg Traurig, LLP
1007 North Orange Street, Suite 1200
Wilmington, DE 19801     Tel: 302-661-7000

Michael Nicodema, Esq.
Barry Schindler, Esq.
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166     Tel: 212-801-9200

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sections 1331, 1338(a), 35 U.S.C. Sections 271 and 281-285

Brief description of cause:
Patent infringement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
11/21/2006

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

American LegalNet, Inc. www.USCourtForms.com

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b.) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**       Example:       U.S. Civil Statute: 47 USC 553
                                                                    Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

American LegalNet, Inc. | www.USCourtForms.com

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2006 NOV 21  AM 10: 25

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 6 -  7 0 3 _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

_____11 - 21 - 06_____
(Date forms issued)

_____Shane Handlin_____
(Signature of Party or their Representative)

_____Shane Handlin_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action